Slip Op. 07-146

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Sherri N. Boynton,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>UNITED STATES,<br><br>　　　　　Defendant. | Before: Pogue, Judge<br>Court No. 06-00095 |

[Plaintiff's motion for judgment on the record denied.  Action
**remanded** to the Secretary of the Department of Homeland Security
for further consideration.]

Decided: October 02, 2007

Law Offices of Robert W. Snyder (Robert w. Snyder) for Sherri N.
Boynton, Plaintiff.

Peter D. Keisler, Assistant Attorney General, Barbara S. Williams,
Attorney in Charge, International Trade Field Office, Aimee Lee,
Civil Division, Dept. Of Justice Commercial Litigation Branch,
Maritza Tamayo-Sarver, of council, Office of Associate Chief
Counsel, U.S. Customs and Border Protection for U.S. Department of
Homeland Security, Customs and Border Protection, Defendant

## OPINION

**Pogue, Judge:**

　　　Plaintiff, Sherri N. Boynton, moves for judgment on the

administrative record pursuant to USCIT Rule 56.1, asking the court

to set aside the decision of the Secretary of the Department of

Court No. 06-00095                                          Page 2

Homeland Security[1] ("the Secretary") revoking her Customs broker's

License.[2]

The Court has jurisdiction over this case under Section 641(e)

of the Tariff Act of 1930, 19 U.S.C. § 1641(e)(1),[3],[4] and 28 U.S.C.

§ 1581(g) (granting the Court of International Trade exclusive

jurisdiction of any civil action to review the revocation of a

Customs broker's License by the Secretary of the Department of

Homeland Security ("DHS")).   In accordance with 19 U.S.C. §

---

[1]In this instance, the revocation decision was made by
Acting Assistant Secretary of the Department of Homeland Security
Elaine Dezenski.

[2]Until January 2003, revocation decisions were made by the
Secretary of the Treasury.  After the reorganization of the
former United States Customs Service revocation decisions are
made by the Secretary of Homeland Security.  6 U.S.C. § 203
(2004).

[3]Citation is to the 2000 edition of the U.S. Code unless
otherwise noted.

[4]19 U.S.C. § 1641(e)(1) provides: In general. A customs
broker, applicant, or other person directly affected may appeal
any decision of the Secretary denying or revoking a license or
permit under subsection (b) or (c), or revoking or suspending a
license or permit or imposing a monetary penalty in lieu thereof
under subsection (d)(2)(B), by filing in the Court of
International Trade, within 60 days after the issuance of the
decision or order, a written petition requesting that the
decision or order be modified or set aside in whole or in part. A
copy of the petition shall be transmitted promptly by the clerk
of the court to the Secretary or his designee. In cases involving
revocation or suspension of a license or permit or imposition of
a monetary penalty in lieu thereof under subsection (d)(2)(B),
after receipt of the petition, the Secretary shall file in court
the record upon which the decision or order complained of was
entered, as provided in section 2635(d) of title 28, United
States Code.

1641(e)(1) and USCIT Rule 56.1(a), the court will review the decision of the Secretary of DHS on the administrative record, considering any objections raised in that proceeding.[5]

Standard of Review

The factual findings of the Secretary must be based on substantial evidence. 19 U.S.C. § 1641(e)(3).  <u>See also</u> 5 U.S.C. § 706(2)(E) and <u>Anderson v. United States</u>, 16 CIT 324, 324 799 F. Supp. 1198, 1199-1200 (1992).  Substantial evidence includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Fusco v. United States Treasury Dep't</u>, 12 CIT 835, 838-39, 695 F. Supp. 1189, 1193 (1988) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Less than the weight of the evidence, the possibility of drawing two inconsistent conclusions from the evidence does not prevent the agency's findings from being supported by substantial evidence.  <u>Barnhart v U.S. Treasury Dep't</u>, 9 CIT 287, 290 613 F. Supp. 370, 373 (1985).

For legal issues, in accordance with 5 U.S.C. § 706(2)(A) the court reviews the Secretary's revocation decision to determine

---

[5]In their briefs, both the government and Boynton sometimes imply that this court is to review the recommendation of ALJ Sippel.  This is incorrect.  Our review is of the decision made by Acting Assistant Secretary Elaine Dezenski for the Department of Homeland Security.  We, like Secretary Dezenski, must sometimes look directly at ALJ Sippel's findings and recommendations to determine whether a particular charge is supported by substantial evidence or not, but it is ultimately the decision of the Secretary that we review.

whether it is "arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law".  <u>See also</u> <u>Barnhart</u>, 9 CIT
at 291, 613 F. Supp. at 374 (The court need only "assure itself the
decision was rational and based on consideration of relevant
factors").

## Background

Plaintiff Sherri N. Kaplan, a.k.a. Boynton received her
Customs broker's License in 1987.  Through July 1, 1998, Plaintiff
worked as the qualifying broker for Southwest Customs Service.[6]  On
July 3, 1998, Boynton wrote to Customs to advise that as of July 1,
1998, she had resigned from Southwest and would no longer be the
licensed individual employed by Southwest.[7]  On July 7, 1998,
Boynton again wrote to Customs to confirm that she had resigned her
position at Southwest effective July 1, 1998.  She updated her
license to use her married name, "Boynton", and stated that she
intended to apply for a permit to operate under her married name.
She submitted an application to operate under the name "Sherri N.
Boynton CB", on July 23, 1998, and informed Customs that all

---

[6]Southwest was assigned filer code "G91" and every entry
submitted by Boynton for Southwest was required to begin with
"G91."  <u>In re Revocation of Customs Broker License of Sherri N.</u>
<u>Boynton</u>, 9 (Feb. 2, 2004, citing Tr. 2445.

[7]There is some lack of clarity in the record as to whether
Boynton took control of some or all of the existing Customs
records or files after she left the employment of Southwest. As
none of the charges upheld by this court depend on this matter,
we do not decide this question.

operations would be conducted at 25031 Oak Street, Lomita, CA
90717, declaring that, "[a]ll files will be kept at this location
in numerical order . . . each file will contain . . . a copy of my
invoice to the customer as their Customs Broker, a copy of the
Entry Summary and any other documents directly pertaining to each
particular importation."   <u>In re Revocation of Customs Broker
License of Sherri N. Boynton</u>, 9-10 (Feb. 2, 2004, citing Tr. 570.)
Boynton reconfirmed her resignation from Southwest on July 27th,
1998.

    Shortly thereafter a new license was issued to Sherri N.
Boynton under her original license number, allowing her to use the
license under her married name.  A new Customs broker permit was
issued to her authorizing her to conduct business as "Sherri N.
Boynton."  The business address on the permit was the same as used
in her application, 25031 Oak Street, Lomita CA 90717-2207.
Boynton was assigned filer code "GE6," requiring every entry she
filed, whether for herself or a client, to begin with "GE6."

    From the time shortly before she left the employment of
Southwest until the initiation of disciplinary actions in August,
2001, numerous problems arose with Boynton's actions as a Customs
broker.  Customs agents advised her, in writing and in person,
about proper procedures and she was placed on national and local

sanctions.[8]  Eventually, on August 9, 2001, the director of the Los

Angeles/Long Beach Port (the "Port Director") requested that

license revocation proceedings be instituted against Boynton.  The

Assistant Commissioner authorized the initiation of preliminary

proceedings on September 11, 2001, and a "Notice of Preliminary

Proceedings and the Notice to Show Cause and Statement of Charges"

was served on Boynton on September 27, 2001.  The Port Director

requested authorization to institute formal revocation proceedings

against Boynton's license on December 20, 2001, and the Assistant

Commissioner authorized the proceedings on February 26, 2002.

Revocation proceedings commenced on March 28, 2002, under the

direction of the former United States Customs Service, now the

United States Customs and Border Protection, a part of the

Department of Homeland Security.  Customs' Notice to Show Cause and

Statement of Charges ("Notice") issued on March 28, 2002 was re-

issued on November 5, 2002 without modification to the charges.  A

formal hearing was conducted at Long Beach, California by

Administrative Law Judge ("ALJ") Sippel, from November 4 until

---

[8]National sanctions are imposed on a Customs broker when her
operation has two defaulted payments of any kind within a 12
month period.  A broker on national sanctions does not have the
privilege of having ten days to file entry summaries and to pay
estimated duties and must submit all documents and duties before
the release of goods.  National sanctions affect a broker or
importer in every port.  Local sanctions have effect only in a
local port and are instituted by local port directors for failure
to file documents or pay duties in a timely fashion or for
defaulting on certain payments.

November 7, 2002, in accordance with the Administrative Procedures

Acts ("APA"), 5 U.S.C. § 554 et seq., and the Customs Rules of

Practice, 19 C.F.R. § 111.62 et seq.   ALJ Sippel issued a

recommendation of license revocation on February 2, 2004.   This

recommendation was reviewed by the Secretary, and a decision

revoking Boynton's license was issued on January 23, 2006. Boynton

filed a timely appeal of the Secretary's decision on March 20,

2006.  It is the revocation decision issued by the Secretary that

we review here.


## Discussion

In her decision revoking Boynton's license, The Secretary

stated, "[b]ased on the record in this case, and in concurrence

with the ALJ's recommended determination, I sustain [Custom's]

proposed revocation of Ms. Boynton's License."   Memorandum for

Commissioner Robert C. Bonner from Acting Assistant Secretary

Elaine Dezenski re revocation of Customs Broker License - Sherri N.

Boynton.   At the same time, the Secretary's decision did not hold

any particular charge or set of charges against Boynton to be

independently sufficient for the revocation of her license.

Customs regulations allows for revocation of a customs

broker's license if, "[t]he broker has violated any provision of

any law enforced by Customs or the rules or regulations issued

under any provision of any law enforced by Customs."  19 C.F.R. §

111.53(c).  See also, 19 U.S.C. § 1641(d)(1)(C).  However, Customs'

policy has generally been to issue progressive penalties and to

reserve revocation of a broker's license only for "egregious"

violations.[9]  An "egregious" violation is a "flagrant act or

omission that shows gross irresponsibility beyond that of a

nonrepetitive [sic] clerical mistake or a good-faith oversight."

Customs Directive Number 099 3530-007 Section 5(B),[10] available at

http://www.cbp.gov/linkhandler/cgov/toolbox/legal/directives/3530

---

[9]"The Customs response to a broker violation depends upon
whether it is egregious (flagrant) or, like most broker
violations, nonegregious.  For nonegregious violations, Customs
will first attempt to work with the broker through communication
and education to improve the broker's overall performance. . . .
If a broker's performance remains unsatisfactory despite
counseling and warning letters, progressive punitive action
should then be taken.  Except for egregious violations, the
sequence of Customs actions to compel compliance by a broker
should generally be:
          o    communication about a particular deficiency
          o    a warning letter
          o    a penalty
          o    a larger penalty and a warning about suspension
          o    suspension/revocation of the license"

Customs Directive Number 099 3530-007 Section 5(A), available at
http://www.cbp.gov/linkhandler/cgov/toolbox/legal/directives/3530
-007.ctt/3530_007.doc

[10]Examples of "egregious" violations given in Customs
Directive Number 099 3530-007 include, "[t]he continued
employment of a felon after Customs has denied the broker
permission for such employment, the continued filing of entries
by a broker after the broker is notified that his or her permit
has been revoked, and the intentional misuse of clients' funds."
Customs Directive Number 099 3530-007 Section 5(B).  As none of
the charges against Boynton fit directly into the enumerated
examples, it is not immediately clear if they are "egregious"
violations or not.

-007.ctt/3530_007.doc.  Thus, under Customs policy, if Boynton has

committed "egregious" violations of Customs rules, then revocation

of her license is warranted.  However, because the Secretary based

her opinion not on a particular enumerated violation or sub-set of

violations, but rather on the record as a whole, the court is

unable to affirm the Secretary's decision unless it upholds each of

her findings.  We therefore must review each of the charges set out

against Boynton under the "substantial evidence" test.  Because the

court may not substitute its judgment as to the appropriate penalty

for Boynton, Barnhart, 9 CIT at 291, 613 F. Supp. at 374, if any

charges remain after our review, the case must be remanded to the

Secretary for further consideration.  The Secretary may then decide

what penalty is appropriate in light of any surviving charges.

The Government objects to this approach, noting that Boynton,

in her brief, did not challenge one charge taken as proven by the

Secretary: charge 5, operating under a name other than that on her

broker's license without permission from or notice to Customs.[11]

The government's position is that, pursuant to 19 C.F.R.

§ 111.53(c),[12] the Secretary could have based her decision on this

---

[11]This charge was challenged by Boynton in her original
complaint to this court.  She did not there, however, offer any
evidence against the charge but merely (and implausibly) blamed
the problem on using an old computer program.  In her brief she
did not challenge this charge, skipping from charge 4 to charge
6.

[12]19 C.F.R. § 111.53:

(continued...)

one uncontested charge and that, given this, remand is not appropriate or necessary. The government is not correct.  If the court were to follow the government's argument it would be substituting the court's judgment for that of the agency.  Because the Secretary did not state that this charge alone would be sufficient to ground a revocation of Boynton's license, we will not make that decision for her now and, as noted, we must review each of the charges against Boynton under the "substantial evidence" test.  If we do not find all of the charges accepted by the Secretary to be supported by substantial evidence, we must remand to the Secretary to determine a consequence in accordance with the remaining charges, if any.  See SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) ("[t]he grounds upon which an administrative order must be judged are those upon which the record discloses the action was based.")

Discussion of Charges

Charge I alleges a violation of 19 C.F.R. § 111.2(a)(2)(ii)(1), requiring that all brokers maintain a power

---

[12](...continued)
The appropriate Customs officer may initiate proceedings for the suspension, for a specific period of time, or revocation of the license or permit of any broker for any of the following reasons:
. . .

(c) The broker has violated any provision of any law enforced by Customs or the rules or regulations issued under any provision of any law enforced by Customs.

of attorney for any employee who signs documents pertaining to Customs business on the behalf of the licensed broker.  While the broker need not file the power of attorney for her employee with the port director, she must provide proof of its existence if requested to do so by Customs.  Here it is alleged that Boynton did not have a properly executed power of attorney for her employee, Mr. Jay Lee, and that nonetheless she had him conduct Customs business on her behalf from September 4, 1998 until July 22, 1999.

ALJ Sippel found, and the Secretary accepted, that this charge had been proven by a preponderance of the evidence.  While Boynton claimed that a proper power of attorney had existed for Mr. Lee since September 4, 1998, it is not disputed that she was unable to produce the power of attorney for customs agents when requested to do so.  Because the regulation in question requires that the needed power of attorney be produced to Customs on demand, and because Boynton was not able to do so, she was in violation of the regulation.  This charge, then, is found to be supported by substantial evidence.

Charge II deals with the proper recording of transactions.  19 C.F.R. § 111.21(a) states, in relevant part, that, "[e]ach broker must keep current in a correct, orderly, and itemized manner records of account reflecting all his financial transactions as a broker.  He must keep and maintain on file copies of all his correspondence and other records relating to his customs business."

Customs presented evidence that Boynton failed to maintain and produce for inspection required records and that she failed to provide an explanation for her inability to produce the documents. This charge involves, in particular, thirteen entries - nine of which were failures to file entry summaries[13] and four of which were failures to pay the required duties.  While Boynton is correct to note that eventually all entries were made and duties paid, the government is correct that under this regulation timeliness is required and that Boynton has not shown any justification for her late filing or her inability to produce the relevant documents when requested to do so by Customs.  While the seriousness of this violation may be considered by the Secretary, in light of the eventual filing by Boynton of all needed paperwork and duties, the charge as stated is supported by substantial evidence and so must be upheld.

Charge III deals with the standard of diligence in correspondence and payments required of a Customs broker.  Customs brokers, as fiduciaries, are held to a higher standard of care than are ordinary businessmen.  Customs Directive 099 3530-007 Section 4.  See also Kazangian v. Brady, 16 CIT 140, 141 (1992).  The standard of diligence in correspondence and payment required of a

---

[13]An entry summary, filed on form CF 7501, is the Customs document required to be filed with estimated duties no later than ten days after release by Customs of the merchandise in question. It provides an itemized listing of the essential information about the imported merchandise for Customs.

Court No. 06-00095                                          Page 13

Customs broker is set out in the relevant parts of 19 C.F.R.

§ 111.29:

> (a) *Due diligence by broker*.  Each broker must exercise
> due diligence in making financial settlements, in
> answering correspondence, and in preparing or assisting
> in the preparation and filing of records relating to any
> customs business matter handled by him as a broker.
> Payment of duty, tax, or other debt or obligation owing
> to the Government for which the broker is responsible, or
> for which the broker has received payment from a client,
> must be made to the Government on or before the date that
> payment is due.  Payments received by a broker from a
> client after the due date must be transmitted to the
> Government within 5 working days from receipt by the
> broker.  Each broker must provide a written statement to
> a client accounting for funds received for the client
> from the Government, or received from a client where no
> payment to the Government has been made, or received from
> a client in excess of the Governmental or other charges
> properly payable as part of the client's customs
> business, within 60 calendar days of receipt. No written
> statement is required if there is actual payment of the
> funds by a broker.

19 C.F.R. § 111.29(a).

Charge III consists of eleven specifications, each of which is

alleged to instance an example of Boynton's failure to meet the

standard of diligence required of a customs broker.  As each of the

specifications is independent, each must be considered to ascertain

if it is supported by substantial evidence.[14]

Specification 1 dates back to the time when Boynton was still

employed by Southwest Customs Services.  One element of the due

---

[14]Conceivably, ALJ Sippel and the Secretary could have
treated this as one discrete charge with the various
specifications being treated merely as evidence for the over-all
charge.  However, because both ALJ Sippel and the Secretary dealt
with each specification in the manner of an individual charge, we
shall do so as well.

diligence owed by Customs brokers is to respond to all Customs correspondence that relates to questions about the timely payment of duties, filing of financial statements, and accounting for checks for funds.  While Boynton was the qualifying broker for Southwest, it received nineteen debit vouchers[15] from Customs as a result of insufficient funds for duty payments.  The Customs Port Director of the Los Angeles/Long Beach Seaport wrote to Boynton on June 8, 1998, while she was still employed at Southwest, to remind her of her due diligence obligations in making financial settlements and instructed her to respond to Customs within 30 days of the receipt of the letter, in writing, indicating the steps she intended to take to ensure prompt payment of duties and to explain the defaulted payments and her failure to properly supervise the brokerage activities.  Boynton did not respond to the Port Director's letter within 30 days.  On July 30, 1998 a memorandum was faxed to Boynton concerning her failure to reply.  Boynton did reply to this message on the 30th of July, 1998, but ALJ Sippel reasonably did not find these explanations to be adequate as to the causes of the problems, as Boynton merely noted that she was no

---

[15]Debit vouchers are bank notices sent to Customs concerning defaulted checks or defaulted Automated Clearing House ("ACH") payments.  Debit vouchers are issued by the bank to the National Finance Center ("NFC").  Upon receipt of a debit voucher, NFC issues a debit voucher bill to the payor of the check, or the owner of the ACH account.  What actions must be taken when a debit voucher is issued depends on the type and cause of the voucher.

longer at Southwest and gestured towards problems with the IRS at Southwest and the Asian financial crisis. None of these explanations were taken as sufficient and, of course, could not explain why Boynton was late in replying to the Port Director's original letter. This charge, then, is supported by substantial evidence and must be upheld.

Charge III Specification 2 relates to the time shortly after Boynton started working under her own name after having left Southwest. Shortly after she started working under her own name, Boynton received four debit notices from Customs due to late payments. Boynton was apparently on national sanctions at the time and so did not qualify for the ten-day privilege in filing payments. However, ALJ Sippel held that Boynton, at this time, had reason to believe that she was no longer on national sanctions and that, given this, she was not unreasonable to believe that she qualified for the ten-day privilege. Additionally, some importers were late in forwarding funds to her. Boynton, at this time, relied on her own interpretation of Customs Bulletin 88[16] on how to

---

[16]Customs Bulletin 88-30 deals with what a Customs broker must do if she does not receive funds in a timely manner from importers. It holds that a Customs broker must submit entry summary documentation even where the broker has not been paid the duties, thereby making the importer liable under its bond for liquidated damages. However, if the broker "knows" that she will be receiving payment from the importer, she is not to use this procedure. Obviously there is room for interpretation on this matter, but Customs eventually gave Boynton specific instruction on the proper interpretation.

deal with late payments by importers.  Boynton had not yet,
apparently, received instruction by Customs on the correct
interpretation of Bulletin 88.  ALJ Sippel did not find, therefore,
that these actions indicated a failure to exercise due diligence by
Boynton and the Secretary did not introduce any additional evidence
on this point.   Neither has the government, in its brief,
introduced any new evidence here.   However, ALJ Sippel, oddly
enough, extended his findings with a matter not directly relevant
to this specification - Boynton's use of a trade name in her
business without approval by Customs, and her unreliable testimony
on this point.   Even assuming, however, that ALJ Sippel was
completely correct in his analysis of Boynton's testimony, at this
point it is hard to see how that finding is directly relevant to
the matter at issue in this specification.  Even though reliability
of testimony is almost always relevant, the lack of reliable
testimony cannot by itself be substantial evidence for this
specification.   Because, apparently, no other evidence was
introduced, and because ALJ Sippel himself held that there was
reason to accept Boynton's account on this issue, this
specification of Charge III is not supported by substantial
evidence and the Secretary's decision on this specification must be
overruled.

Charge III Specification 3 was found not to be substantiated
by the Secretary.  Accordingly, we need not consider it here.

Charge III Specification 4 involves failure to forward duties to Customs in a timely manner.   In particular, Customs analyzed Boynton's entries from September 4, 1998 to March 14, 2000, disclosing 312 late payments.   Boynton does not contest that the payments were made late but does insist that 125 were only a few days late and that there was no conversion of funds.   The latter matter, however, is not directly at issue in this charge as here the issue is merely the timeliness, or lack thereof, of duties being forwarded to Customs.   Because Boynton does not question the lateness of forwarding of duties, and this is in itself evidence supporting that determination, the charge is therefore supported by substantial evidence and must be upheld.

Charge III Specification 5 involves a failure to pay on ten out of twenty-two late-filed entries for importer KOS America, Inc. ("KOS").   Here ALJ Sippel held that Customs had not introduced evidence sufficient to show that this failure to pay was due to a failure to exercise due diligence by Boynton.   Although some evidence pointed to her, other evidence pointed to either KOS, who had the ultimate obligation to make sure payment was made, or alternatively to the freight forwarder General Forwarding, Inc., employed as an agent by KOS.   The Secretary disagreed with ALJ Sippel here, arguing that by failing to use Customs Bulletin 88 procedures, Boynton had failed to exercise due diligence.   It is clear that Boynton did not here properly use Bulletin 88 procedures

and that this was a problem.   However, the specification in question does not charge her with failure to use Bulletin 88 procedures in this instance but rather with failure to make payments.  Because substantial evidence does not support the charge that this failure to make payments was Boynton's fault or responsibility, this failure in itself cannot constitute a lack of due diligence, even if Boynton also did not do something else that she ought to have.  Therefore, this specification is not supported by substantial evidence, and the decision by the Secretary on this point is overruled.

Charge III Specification 6 deals with eight additional cases of late or non-paid duties not included in the above specifications dating back to the time when Boynton was the qualified broker for Southwest.  Customs presented evidence that Boynton's failure to exercise due diligence in these cases lead to liquidated damages being assessed against the importers and a surety, International Bond & Marine.  Boynton claimed that this was not her fault as she had left the employment of Southwest; however, as she had been the qualified broker at the time of the transactions, she retained responsibility for the non-paid duties.  This charge is therefore supported by substantial evidence and must be upheld.

Charge III Specification 7 deals with monies totaling $119,496.72 paid to Boynton by importer National Media Corporation ("NMC") but not forwarded to Customs.  Substantial evidence

supports the charge that Boynton received monies paid by NMC to pay
duties but that these monies were not forwarded to Customs,
resulting in liquidated damages being assessed against NMC.
Boynton claimed not to have had a power of attorney to file claims
for NMC but she concedes that she did have power of attorney for
the company E4L, a subsidiary of NMC. Boynton also claimed that
the whole matter was due to a clerical mistake with customs at Los
Angeles International Airport ("LAX"). No evidence was introduced,
however, to support this claim, while Customs provided substantial
evidence that the funds forwarded to Boynton by NMC were not paid
to Customs. This specification, then, is supported by substantial
evidence and must be upheld.

Charge III Specification 8 relates to an instance where
Customs instructed Boynton on procedures to resolve 14 entries and
overdue payments. Boynton followed these procedures in the large
majority of the cases but not all. The record thereafter is
unclear, with Boynton claiming, and ALJ Sippel holding, that
payment for one entry of the 14 was made two weeks late and the
Secretary insisting that 3 of the 14 entries were paid late.
Neither Boynton nor the government in their briefs identify further
clarifying evidence. The dispute in question is not, as such,
whether some number of entries were paid late, but rather whether
Boynton's actions here constituted a failure of due diligence.
Given that the record is unclear and given that, either way,

Boynton paid the large majority of the entries on time and eventually paid all entries within two weeks, the court here agrees with ALJ Sippel that this specification is not substantiated and holds that the decision of the Secretary in this instance is not supported by substantial evidence.

Charge III Specification 9 deals with a particular late payment made by Boynton.  In this instance, Boynton failed, for several months after she received funds, to remit duties received via a freight forwarder for a client.  In the meantime, Boynton told the client that the funds had been forwarded.  The exact cause of the late payment is not, from the evidence, completely clear. However, it is clear that Boynton was responsible for taking proper measures here and did not.  This charge is therefore supported by substantial evidence and must be upheld.

Charge III Specification 10 deals with an instance where Boynton filed an entry late and with the wrong sum of money.  The entry was late but not so late that penalties were assessed on the importer in this case.  ALJ Sippel held that the problem with the sum for the payment was apparently a simple clerical error and that, given these facts, this was not an instance of a failure to exercise due diligence.  The Secretary disagreed here with ALJ Sippel, insisting that this instance must be viewed in the light of the other charges against Boynton and that this indicates a pattern of violations.  This is not correct.  Either this particular

instance in itself indicates a failure to exercise due diligence or it does not. That Boynton may have failed to exercise due diligence in other cases does not make this such a case. The Secretary also here seeks to rely on the "presumption of regularity" granted to government action, arguing that we must assume Customs to have considered all available evidence. Such a presumption cannot substitute for the factual findings called for by statute and the regulations. See, e.g., _Truong v. United States Sec'y of Agr._, 484 F. Supp. 2d 1324, 1329. It was not ALJ Sippel who attempted to re-weigh the evidence in this specification but rather the Secretary. This specification is not supported by substantial evidence and cannot be upheld.

Charge III Specification 11 deals with fifteen importers being placed on local sanctions due to Boynton's failure to submit duty payments in a timely fashion, requiring the importers to file live entries and make payment of duties by cashiers check, money orders, or cash. Boynton contends that these late payments were not her fault but rather stemmed from the use by these importers of a freight forwarder who in turn made late payments. The record does not provide conclusive evidence as to this matter. However, Customs regulations do make provisions for such cases via the use of Bulletin 88 procedures, which define the broker's responsibilities. See _supra_ note 16. By the time that these instances arose, Boynton had been instructed by Customs in the

correct Bulletin 88 procedures on numerous occasions.  Because she
did not properly follow Bulletin 88 procedures in these cases, she
must be held responsible for the results.  Substantial evidence,
then, supports the charge of a failure to exercise due diligence in
this instance.

Charge IV Specification 1[17] relates to the requirement that a
Customs broker keep Customs informed of her actual business address
at all times.  19 C.F.R. § 111.30(a) states, in relevant part,
"(a) *Change of address*.  When a broker changes his business
address, he must immediately give written notice of his new address
to each director of a port that is affected by the change of
address."  It is agreed by all parties that, when she applied to
work under her own name, Boynton listed 25031 Oak Street, Lomita CA
90717 as her correct business address and that she at no time gave
written notice of a change of address to Customs or the relevant
port director.  Customs contends, however, that soon after she
started working under her own name, Boynton began conducting
business at an unauthorized address, 9100 Sepulveda Blvd., Suite
102A, Los Angeles, CA 90045.  Customs contends, and both ALJ Sippel
and the Secretary held, that Boynton had conducted significant
business at the Sepulveda Blvd. address without notifying Customs.
(This action was, in turn, apparently connected with the use of the

---

[17]Specification 2 of Charge IV was held to be
unsubstantiated by ALJ Sippel and accepted as such by the
Secretary and so needs not be discussed here.

unauthorized name "SCS" dealt with in the fifth charge and discussed below.)

Boynton counters that, firstly, she did not do significant business at the Sepulveda Blvd. address, but rather merely used it to store and sort out files.  Alternatively, she argues, Customs had constructive notice of her change of address because she listed this address on filings sent to Customs, and Customs came to this address to interview her former employee, Mr. Jay Lee.

Customs' charge, and the Secretary's decision, is here supported by substantial evidence.  Boynton had business cards for herself and for Jay Lee printed listing the Sepulveda address and she, at her own admission, listed the address in Customs filings. Mr. Lee worked from this address and importers sent information to it.  Boynton was told by Customs in a letter dated June 28, 2000, to stop using the address, but she continued to do so.  Her argument that Customs had constructive notice of a change of address cannot serve here as this merely shows that she was, in fact, using this address without giving the actual written notice required by the regulations.  This charge, then, must be upheld.

Charge V deals with the use of the unauthorized name "SCS" and various versions of this (e.g., "Special Consulting Services," "Sherri's Customs Services," etc.) by Boynton.   19 C.F.R. § 111.30(c) states:

> *Change in name*.  A broker who changes his name, or who
> proposes to operate under a trade or fictitious name in

one or more States within the district in which he has
been granted a permit and is authorized by State law to
do so, must submit to the Office of Field Operations,
U.S. Customs Service, Washington, D.C. 20029, evidence of
his authority to use that name.  The name must not be
used until the approval of Headquarters has been
received.  In the case of a trade or fictitious name, the
broker must affix his own name in conjunction with each
signature of the trade or fictitious name when signing
customs documents.

Boynton has not challenged Customs' claim that, at the time she was
issued a license to work on her own on September 4, 1998, the
correct name of the brokerage was "Sherri N. Boynton."
Specification 1 of Charge V deals with Boynton's use of the "SCS"
acronym and related extensions while Specification 2 deals with
Boynton's use of Southwest's filer code, G91, along with both the
name "Southwest" and the name "SCS", after her resignation from
Southwest during July of 1998.  Customs has provided substantial
evidence to support these charges, and they are not contested by
Boynton in her brief to the court.[18]  Therefore, the findings of the
Secretary that Boynton violated section 111.30(c) must be upheld.

Charge VI deals with the use of a problematic power of
attorney by Boynton and her employee, Jay Lee.  19 C.F.R. § 111.32
states, in relevant part, "[a] broker must not file or procure or

---

[18]As noted, in her initial complaint Boynton did contest
these charges.  She did not at that point cite any significant
evidence that would have brought the Secretary's decision into
question, and in her brief to the court she does not contest this
charge, moving from Charge IV to Charge VI without addressing
this issue, apparently conceding the charge.

assist in the filing of any claim, or of any document, affidavit, or other papers, known by such broker to be false." Here Customs charged, and the Secretary found, that Boynton submitted a false power of attorney to Customs for the company Circuit Systems. Although there was no showing of intentional fraud or forgery on Boynton's part, the power of attorney in question contained such significant "red flags" that both ALJ Sippel and the Secretary held it appropriate to attribute "knowledge" of the falsity of the power of attorney to Boynton.[19]

Boynton, in her reply, points to ALJ Sippel's conclusion that there was no significant evidence of fraud or forgery on her part. This is, of course, an important fact, but not one that goes to the heart of the charge at issue here. Rather, to rebut the charge, Boynton would have to show either that the power of attorney in question was, despite the evidence otherwise, in fact a true document or else show that knowledge of the falsity of the document could not properly be attributed to her. She has not presented any such evidence. Because the finding of the Secretary is supported by substantial evidence, this charge must be upheld.

Charge VII was held to be not substantiated by both ALJ Sippel

---

[19]For example, the power of attorney in question contained multiple fonts, misidentified Circuit Systems as a corporation rather than as a limited partnership, contained a false signature from Mr. John Broyles as well as mis-identified him as the company president rather than his correct title of "production/quality manager" and misspelled his name.

and the Secretary and so does not need to be reviewed.

Charge VIII pertains to Boynton's failure to file timely entries. The relevant regulation, 19 C.F.R. § 142.15, states in pertinent part:

> If the entry summary documentation is not filed timely, the port director shall make an immediate demand for liquidated damages in the entire amount of the bond in the case of a single entry bond. When the transaction has been charged against a continuous bond, the demand shall be for the amount that would have been demanded if the merchandise had been released under a single entry bond.

Between September 1998 and March 14, 2000, Boynton filed a total of 322 late entry summaries. These entry summaries were an average of 20 days late, with one entry being as much as 264 days late.[20]  As a result of Boynton's tardiness in filing these entries, importers were assessed liquidated damages, and the government estimated its losses to be $579,385. Boynton contends that these late filings were all due to late payments to her of duties by importers. This is, perhaps, possible, but does not relieve Boynton of responsibility because, in such cases, she would be obligated to follow procedures set out in Customs Bulletins 88 and 93. Boynton was informed of these procedures in writing on May 7, 1999 and December 30, 1999, as well as telephonically on May 7, 1999, June 15, 1999, October 15, 1999, and October 25, 1999. Boynton was

---

[20]These are, apparently, the same late entries discussed in Charge III Specification 4.  The legal issue here, however, is distinct.

additionally provided with copies of Treasury Decision 89-49 and

Public Bulletins 88 and 93, documents containing procedures on what

to do in such situations.  Boynton claims that these procedures are

inherently confusing, but it is unclear how this, even if true,

would negate her responsibility here, which is clear.  The charge

is supported by substantial evidence and must be upheld.

Charge IX is a somewhat general charge of a "failure to

supervise."  19 C.F.R. § 111.28(a) states, in pertinent part:

> (a) *General.* Every individual broker operating as a
> sole proprietor and every licensed member of a
> partnership that is a broker and every licensed officer
> of an association or corporation that is a broker must
> exercise responsible supervision and control . . . over
> the transaction of the customs business of the sole
> proprietorship, partnership, association, or corporation.

This is a "catch all" charge holding Boynton responsible for the

actions of her employees and for all brokerage business conducted

in her name that resulted in violations of Customs regulations.

Customs incorporated by reference in this charge charges I-VIII.

Insofar as this can be considered a distinct charge, and insofar as

the various charges and specifications of charges hereby

incorporated have been upheld as supported by substantial evidence,

this charge is also supported by substantial evidence.

Conclusion

The Secretary has reasonably found that Boynton violated several Customs rules and regulations, often on multiple occasions. The Secretary's findings of violations of Customs rules and regulations are supported by substantial evidence, and must be upheld, in Charges I, II, IV, V, VI, VIII, IX, and for Specifications 1, 4, 6, 7, 9, and 11 of Charge III. However, not all of the Secretary's findings are supported by substantial evidence. Specifications 2, 5, and 8 of Charge III,[21] as well as Charge VII are not supported by substantial evidence and so must be overturned. The Secretary based her decision to revoke Boynton's license "on the record", without specifying which charges, jointly or alone, would be sufficient to warrant a revocation of Boynton's license, the most serious penalty Customs may impose here. Because, after our review, "the record" is no longer the same as that on which the Secretary based her decision as to an appropriate penalty, it is necessary for us to remand the case to the Secretary to consider what penalty is appropriate given the charges that remain after our review.

Remand results are ordered by November 1, 2007. Plaintiff may file any objections to the remand results by November 23,

---

[21]Recall that the Secretary agreed that Specification 3 of Charge III was not substantiated.

2007.  Any reply should be by December 14, 2007.  It is so

ORDERED.


                                        __/S/ Donald C. Pogue_____
                                        Donald C. Pogue, Judge

Dated: Oct. 02, 2007
       New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                              Deputy Clerk